| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>SALDUTTI LAW GROUP<br>Rebecca K. McDowell, Esquire – RM3223<br>1040 Kings Highway North, Suite 100<br>Cherry Hill, NJ 08034<br>(856) 779-0300<br>Counsel for 1st Colonial Community Bank | |
| In Re:<br><br>Brian Wolfson,<br><br>       Debtor. | Case No.:  23-15941-ABA<br><br>Adv. No.:<br><br>Chapter:  7 |
| 1ST COLONIAL COMMUNITY BANK,<br><br>    Plaintiff,<br><br>v.<br><br>BRIAN WOLFSON,<br><br>    Defendant. | Hrg Date:<br><br>Judge:  Hon. Andrew B. Altenburg, Jr. |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**
**PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(4)**

   NOW COMES Plaintiff, 1ST COLONIAL COMMUNITY BANK ("Plaintiff"), by and

through counsel, Saldutti Law Group, and for its Complaint to determine the dischargeability of

debt owed to Plaintiff by Brian Wolfson ("Debtor") pursuant to 11 U.S.C. §§ 523(a)(2)(A),

523(a)(2)(B), and 523(a)(4) sets forth as follows.

<u>**PARTIES**</u>

   1.  Plaintiff is a financial institution headquartered at 1000 Atrium Way, Suite 200,

Mt. Laurel, New Jersey.

2.    Debtor is an individual residing at 110 Munn Lane, Cherry Hill, New Jersey, and is the bankruptcy debtor in the underlying bankruptcy case.

## JURISDICTION AND VENUE

3.    Plaintiff hereby restates and incorporates the preceding paragraphs as though fully set forth at length herein.

4.    This Court has jurisdiction of the within matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), (b)(2), and the July 23, 1984 United States District Court for the District of New Jersey standing order of reference.

5.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.    This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I).

## FACTUAL BACKGROUND

7.    Plaintiff hereby restates and incorporates the preceding paragraphs as though fully set forth at length herein.

8.    Upon information and belief, Debtor is the managing member of two (2) limited liability companies: JW Home, LLC ("JW Home") and The Funny Farm, LLC ("Funny Farm").

9.    Upon information and belief, Debtor is a 75 percent member of JW Home.

10.    Upon information and belief, the remaining 25 percent ownership interest in JW Home belongs to Debtor's adult daughter, Jenna Wolfson ("Jenna").[1]

11.    Upon information and belief, Debtor is the sole member of Funny Farm.

12.    In 2016, Debtor and his non-filing spouse, Laurie Wolfson ("Laurie") acquired the real property located at 110 Munn Lane, Cherry Hill, New Jersey ("Property").

---

[1] The use of first names herein to identify members of Debtor's family with the same last name as Debtor is not to create an impression of disrespect to those named or to the Court, but to avoid confusion.

13.     Upon information and belief, in 2017, Debtor and Laurie (collectively "Borrowers") began the process of applying for construction loans to build a house and stables at the Property ("Project").

14.     Specifically, Borrowers applied at Fulton Bank ("Fulton") in or around April 2017.

15.     Fulton denied Borrowers' loan request on June 15, 2017, due to "foreclosure or repossession in credit history" and "delinquent credit obligations".

16.     At the time of the June 15, 2017 Fulton denial, Borrowers had owned other real properties that were the subject of multiple foreclosure complaints, foreclosure judgments, and writs:

   a.  In Wilshire Financial Services Group Loan Display v. Brian Wolfson, Docket No. F-960-06 ("Wiltshire Foreclosure"), the foreclosing plaintiff sought foreclosure of Borrowers' prior residence located at 268 Merion Ave., Haddonfield, New Jersey ("268 Merion Ave.").

   b.  On or about May 4, 2006, a Final Judgment of Foreclosure was entered in the Wiltshire Foreclosure.

   c.  On or about July 19, 2011, a Writ of Execution in the amount of $110,693.95 was entered in the Wiltshire Foreclosure.

   d.  In U.S. Bank v. Brian Wolfson, Docket No. F-2295-06 ("US Bank Foreclosure"), the foreclosing plaintiff sought foreclosure of 268 Merion Ave.

   e.  The US Bank Foreclosure was dismissed on or about May 3, 2006.

   f.  In U.S. Bank v. Brian Wolfson, Docket No. F-15982-06 ("2nd US Bank Foreclosure"), the foreclosing plaintiff sought foreclosure of 268 Merion Ave.

   g.  A Final Judgment of Foreclosure was entered in the 2nd US Bank Foreclosure.

   h.  On or about January 2, 2007, a Writ of Execution in the amount of $377,256.18 was entered in the 2nd US Bank Foreclosure.

i.    In U.S. Bank v. Brian Wolfson, Docket No. F-13724-08 ("3rd US Bank Foreclosure"), the foreclosing plaintiff again sought foreclosure of 268 Merion Ave.

j.    On or about June 11, 2008, the 3rd US Bank Foreclosure was dismissed.

k.    In U.S. Bank v. Brian Wolfson, Docket No. F-0435-09 ("4th US Bank Foreclosure"), the foreclosing plaintiff again sought foreclosure of 268 Merion Ave.

l.    On or about June 24, 2010, the 4th US Bank Foreclosure was dismissed.

m.    In U.S. Bank v. Brian Wolfson, Docket No. F-13165-13 ("5th US Bank Foreclosure"), the foreclosing plaintiff again sought foreclosure of 268 Merion Ave.

n.    On or about February 4, 2016, Final Judgment of Foreclosure was entered in the 5th US Bank Foreclosure in the amount of $645,024.32.

o.    On or about March 3, 2016, a Writ of Execution was issued in the 5th US Bank Foreclosure.

p.    On or about May 13, 2016, the Superior Court denied Borrowers' motion to vacate the Final Judgment of Foreclosure entered in the 5th US Bank Foreclosure.

q.    On or about June 8, 2016, Borrowers filed a post-Judgment notice of settlement of the 5th US Bank Foreclosure.

r.    In PA Portfolio Investors, LLC v. Brian Wolfson, Docket No. F-25925-10 ("PA Portfolio Foreclosure"), the foreclosing plaintiff sought foreclosure of Debtor's investment property at 55 Newton Ave., Woodbury, New Jersey ("55 Newton Ave.").

s.    On or about December 17, 2010, the Superior Court appointed a Rent Receiver for 55 Newton Ave. in the PA Portfolio Foreclosure.

t.    The Superior Court entered a Final Judgment of Foreclosure in the PA Portfolio Foreclosure.

u.    On or about February 14, 2012, a Writ of Execution was entered in the PA Portfolio Foreclosure.

v.    On or about March 28, 2012, a Sheriff Sale sold 55 Newton Ave. in the PA Portfolio Foreclosure.

(collectively "Prior Foreclosure Actions").

17.    On October 25, 2017, Borrowers reapplied to Fulton.

18.    On November 9, 2017, Fulton emailed to Debtor an "Open Conditions" document ("First Fulton Conditional Approval"), which provided that a commitment letter would be issued upon receipt of a satisfactory appraisal, and such commitment letter would be subject to the conditions identified in the First Fulton Conditional Approval.

19.    The First Fulton Conditional Approval provided that Fulton would not modify the loan without satisfactory completion of the Property per plans and specifications with a final inspection and photos.

20.    The First Fulton Conditional Approval provided that any changes to Borrowers' credit history, assets, or employment, or changes to the Property, may cause the approval to be rescinded.

21.    Fulton further required a final Certificate of Occupancy ("CO") to verify completion of construction.

22.    On March 5, 2018, Fulton emailed to Debtor another "Open Conditions" document ("Second Fulton Conditional Approval") identifying the same conditions as the First Fulton Conditional Approval.

23.    On March 9, 2018, Fulton emailed to Debtor a third "Open Conditions" document ("Third Fulton Conditional Approval") identifying the same conditions as the First and Second Fulton Conditional Approvals.

24.    On March 20, 2018, Fulton emailed Debtor its appraisal of the Property, which valued the Property at $1.56 million.

25.     On March 20, 2018, Fulton issued a written denial of Borrowers' loan application based upon the appraisal described in Paragraph 24 above, indicating insufficient value of collateral as the reason for the denial.

26.     Fulton and Borrowers continued to communicate about a possible loan, and on March 28, 2018, Debtor emailed Fulton to request status of loan review, a new appraisal, and a settlement date.

27.     On  March 29, 2018, Borrowers signed loan disclosures for the Fulton application, which disclosures indicated, in pertinent part: that Fulton would not disburse the final 5 percent of loan proceeds without a final inspection satisfactory to Fulton and without a CO issued by the city or county without exceptions; that Fulton would deem the Project complete when Fulton's  inspector and the municipal inspectors deemed the Project complete; and that events of default include a failure to complete the Project timely as well as material adverse changes in the financial condition of Borrowers.

28.     At a deposition in later proceedings, Debtor testified that he understood these terms to be reasonable, ordinary, customary, and consistent with his understanding.

29.     Debtor also testified at a deposition that he understood the requirement to provide updated financials to Fulton.

30.     As of April 9, 2018, Debtor was aware that Fulton had issued two written denials.

31.     As of April 9, 2018, Debtor was aware that Fulton's appraisal failed to support Borrowers' loan application.

32.     As of April 9, 2018, Debtor was aware that no closing date was scheduled with Fulton.

33.     As of April 9, 2018, Debtor was aware that Fulton had not issued a commitment letter.

34.     As of April 9, 2018, Debtor was aware that Fulton required a second appraisal.

35.     As of April 9, 2018, Debtor was aware that any approval by Fulton would require Fulton's loan committee to approve an exception.

36.     On April 9, 2018, while the application with Fulton was still pending, Debtor contacted Plaintiff about applying for a construction loan for the Project.

37.     Also on April 9, 2018, Debtor sent Plaintiff copies of the Project plans and Fulton's first appraisal.

38.     Also on April 9, 2018, Debtor represented to Plaintiff, via email, that Fulton had approved him for a $1.5 million loan.

39.     Debtor knew that his representation was false, as he knew that his loan application with Fulton was not approved, as Fulton still required an updated appraisal and an exception from Fulton's loan committee.

40.     On April 9, 2018, Debtor emailed Plaintiff a copy of Borrowers' agreement with Haven Home Builders, LLC ("Haven"), the general contractor for the Project, along with a budget.

41.     Also on April 9, 2018, Debtor emailed Plaintiff a Personal Financial Statement dated September 12, 2017, that he had previously submitted to Fulton ("2017 PFS").

42.     The 2017 PFS valued Borrowers' total assets in excess of $3.3 million with liabilities of about $1.26 million for a net worth of approximately $2.08 million.

43.     Debtor represented that the 2017 PFS was "pretty close" and "the stock and 401k are up" from the amounts listed on the 2017 PFS.

44. The 2017 PFS included the 268 Merion Ave. property, which was Borrowers' residence at the time.

45. Debtor also represented that in addition to the assets on the 2017 PFS, the application should include "cash on hand" of $211,289.30 that he expected to receive as the sole beneficiary of his father's estate.

46. As of April 9, 2018, Borrowers were also in the process of applying for another mortgage loan from Fulton for 268 Merion Ave. ("Fulton Merion Application").

47. Debtor did not disclose the pending Fulton Merion Application to Plaintiff.

48. On April 10, 2018, Debtor emailed Plaintiff a copy of Fulton's second appraisal as well as an email from Fulton quoting interest rates, dated March 15, 2018, and representing that he had a commitment letter from Fulton if Plaintiff wanted to see it.

49. As of April 10, 2018, Fulton had not issued a commitment letter.

50. Debtor's April 10, 2018 email to Plaintiff included a forwarded email from Fulton to Debtor dated March 15, 2018 providing a potential closing date and a hope for a rate lock.

51. As of April 10, 2018, when Debtor forwarded Fulton's March 15, 2018 email to Plaintiff, Debtor knew that Fulton had already denied his application.

52. In Debtor's April 10, 2018 email to Plaintiff, in which he forwarded Fulton's March 15, 2018 email, Debtor referred Plaintiff to "the terms Fulton offered" and requested discussion after Plaintiff "absorbed" the information.

53. Debtor did not disclose to Plaintiff that Fulton had twice denied his loan applications, in writing.

54. Debtor did not disclose to Plaintiff that his application with Fulton required exception approval by Fulton's loan committee.

55.     Debtor's April 10, 2018 email forwarding Fulton's March 15, 2018, materially misrepresented the status of Debtor's loan application with Fulton.

56.     Debtor forwarded Fulton's March 15, 2018 email to Plaintiff knowing that the email materially misrepresented the status of Debtor's loan application with Fulton.

57.     Debtor intended for Plaintiff to rely upon the material misrepresentation he made with respect to the status of his application with Fulton.

58.     In response to Debtor's April 10, 2018 email, Plaintiff emailed Debtor to advise of Plaintiff's standard construction loan terms, which provide for a construction loan of up to 24 months, repaid at interest only at a rate of Prime plus, to be modified to a permanent loan once a CO is issued.

59.     Debtor later testified at a deposition that he understood this email to mean that Plaintiff's reference to a "CO" meant completion of the Project.

60.     On April 11, 2018, Debtor emailed Plaintiff and requested a commitment letter.

61.     Also on April 11, 2018, Debtor emailed Fulton requesting status of his application with Fulton; Fulton responded that the application was with the loan committee.

62.     At the time Debtor emailed Fulton on April 11, 2018, Debtor had already represented to Plaintiff that Fulton had approved him for a loan.

63.     On April 12, 2018, Borrowers provided financial information to Plaintiff for their loan application with Plaintiff, including information on their employment, assets, and liabilities.

64.     On April 12, 2018, Debtor represented to Plaintiff that Borrowers owned 268 Merion Ave. in addition to 248 Merion Ave., Haddonfield, New Jersey ("248 Merion Ave.") and 214 13th St., Brigantine, New Jersey ("Brigantine") (collectively "Other Properties"), with an aggregate value of $2.047 million with only $816,000 in mortgages.

65.     At that time, Debtor also specifically represented that 248 Merion Ave. was not subject to any liens or mortgages.

66.     On April 12, 2018, Debtor represented to Plaintiff that his base monthly income was $19,583 and his monthly commissions were $62,500.

67.     As of April 12, 2018, Debtor was aware that his income would decrease considerably in 2019, but he failed to disclose that knowledge to Plaintiff.

68.     On April 12, 2018, Plaintiff provided a commitment to Debtor for a $1.6 million construction loan payable over a 12-month term ("Loan").

69.     Also on April 12, 2018, after Plaintiff provided its commitment, Debtor emailed Fulton requesting Fulton's proposed rate and term to "refresh his memory".

70.     On April 14, 2018, Debtor emailed Plaintiff to advise that he would stop processing the Fulton loan, forwarding his email to Fulton of the same day advising Fulton that another bank had agreed to provide funding within 24 hours.

71.     Fulton issued another commitment letter, but on April 26, 2018, Debtor emailed Fulton and advised that he would be proceeding with Plaintiff.

72.     On May 7, 2018, Borrowers again provided financial information as to their assets and liabilities.

73.     On May 7, 2018, Debtor again represented to Plaintiff that Borrowers owned the Other Properties with an aggregate value of $2.067 million and mortgage balances of $816,000 for total equity of $1.251 million.

74.     On May 7, 2018, Debtor again represented to Plaintiff that 248 Merion Ave. was not subject to any mortgages.

75. From April 12, 2018 to May 7, 2018, the period of Borrowers' application process with Plaintiff, Borrowers did not own 248 Merion Ave., which was owned by JW Home.

76. As of April 12, 2018, and through May 7, 2018, 248 Merion Ave. was subject to a mortgage in favor of Fulton in the amount of $551,250, which mortgage was dated March 20, 2018.

77. Debtor knew that JW Home owned 248 Merion Ave. and not Borrowers.

78. Debtor knew that 248 Merion Ave. was not owned free and clear.

79. During the application process between April 12, 2018 and May 7, 2018, Debtor represented to Plaintiff that his liabilities included credit obligations owed to Capital One Bank, Comenity Capital, Fulton Bank, Wells Fargo, Fulton Bank, Kubota Credit, Mercedez-Benz, GM Financial, KeyBank, Citi, American Express, Credit One Bank, TD Bank, and Merrick Bank Corp.

80. At all times relevant to Borrowers' application, including the period of April 9, 2018 to May 7, 2018, Debtor was indebted as the Guarantor on a loan to JW Home secured by a mortgage in another property located at 228 Hopkins Ave., Haddonfield, New Jersey ("228 Hopkins Ave.") in the principal amount of $497,000.00 ("Hopkins Ave. Obligation").

81. During the application process between April 12, 2018 and May 7, 2018, Debtor represented to Plaintiff that the Brigantine Property was encumbered by $564,864.00 of mortgage liens.

82. At the time of Borrowers' application to Plaintiff, the Brigantine Property was encumbered by two Fulton mortgages dated October 3, 2017 and January 1, 2018 in the principal amounts of $424,100.00 and $204,000.00, respectively.

83.     At the time of Borrowers' application to Plaintiff, the Brigantine Property was also the subject of a mortgage dated October 3, 2017 from Baysea Properties, LLC in the principal amount of $204,000.00.

84.     In the six (6) months prior to Borrowers' application to Plaintiff, they had granted mortgage liens totaling $843,000.00 in the Brigantine Property – a difference of nearly $300,000.00 from the balance of mortgage liens identified on Borrowers' application.

85.     Borrowers failed to identify Baysea Properties, LLC as a mortgage holder or creditor.

86.     Debtor failed to disclose his indebtedness as the guarantor of the Hopkins Ave. Obligation.

87.     During the application process between April 12, 2018 and May 7, 2018, Borrowers represented to Plaintiff that Borrowers had no property foreclosed upon in the last seven (7) years; Borrowers had never been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment; and Borrowers were not the co-makers or endorsers on a note.

88.     At the time of Borrowers' application to Plaintiff, Borrowers had been the owners of multiple properties that were the subject of foreclosure actions and foreclosure judgments in the prior seven (7) years, as set forth above.

89.     At the time of Borrowers' application to Plaintiff, Debtor was the guarantor of the Hopkins Ave. Obligation.

90.     At the time of Borrowers' application, Borrowers knew of the Prior Foreclosure Actions.

91.     At the time of Borrowers' application, Debtor knew that he was personally obligated on the Hopkins Ave. Obligation.

92.     The Loan between Borrowers and Plaintiff closed on May 7, 2018.

93.     In connection with the Loan, Borrowers submitted a Uniform Residential Loan Application, which they both signed and dated ("Loan Application").

94.     Also in connection with the Loan, Borrowers executed an Adjustable Rate Note of even date by which Borrowers promised to make monthly interest-only payments to Plaintiff until June 1, 2019, at which time the entire balance would be due and payable immediately and in full ("Note").

95.     Also in connection with the Loan, Borrowers executed a Construction Loan Agreement of even date, which provided that the loan proceeds, not to exceed $1.6 million, were to be used to complete the Project ("Loan Agreement").

96.     The Loan Agreement further provides that loan proceeds would be distributed according to the draw schedule attached thereto, and any advances were subject to Plaintiff's approval.

97.     The Loan Agreement further provides that prior to any draws, upon Plaintiff's request, Borrowers must provide documentation of the use of all previous draws.

98.     The Loan Agreement further provides that Borrowers shall, upon Plaintiff's request, submit any documentation to substantiate use of loan funds for Project costs.

99.     The Loan Agreement further provides that hard construction costs are limited to the amounts in the "Use of Proceeds" schedule attached thereto.

100. The Loan Agreement further provides that Borrowers shall not enter into or authorize entering into any material change orders in excess of $10,000 without Plaintiff's prior written approval.

101. The Loan Agreement further provides that Borrowers were responsible for providing all temporary or permanent COs issued by the appropriate governmental authorities within 30 days after the completion of each part of the Project.

102. The Loan Agreement further provides that in the event temporary COs are issued, Borrowers will take all steps necessary to obtain permanent COs within six months from the issuance of the temporary CO.

103. The Loan Agreement further provides that Borrowers shall timely file all tax returns, pay their debts when they come due, furnish annual tax returns and financial statements, and maintain complete records relating to the Property.

104. The Loan Agreement further provides that Borrowers shall provide written notice to Plaintiff of any event of default.

105. The Loan Agreement further provides that events of default include failure to make payments; failure to perform any obligation under the Loan Agreement or any of the other loan documents; and failure to complete the Project in accordance with the Loan Agreement's terms on or before the required completion date.

106. To secure the Note, Borrowers granted Plaintiff a mortgage on the Property, which was recorded with the Camden County Clerk on May 26, 2018, at Book 10892, Page 1091 ("Mortgage").

107. The Loan Application included the information Borrowers had previously provided to Plaintiff, including Debtor's income, list of creditors and balances due, mortgage balances and property values.

108. The Loan Application indicated that there were no foreclosures within the last seven (7) years and that Borrowers have never been directly or indirectly obligated on any loans that resulted in foreclosure.

109. The Loan Application indicated that neither of the Borrowers were co-makers or endorsers on a note.

110. The Loan Application contains an acknowledgement and agreement that the information provided therein was true and correct as of the signature date.

111. On or about June 29, 2018, Borrowers granted Fulton a mortgage on the Brigantine Property in the principal amount of $642,000.00; they did not disclose this to Plaintiff.

112. On or about July 27, 2018, Borrowers granted Fulton a mortgage on 268 Merion Ave. in the principal amount of 347,000.00; they did not disclose this to Plaintiff.

113. On or about September 28, 2018, Borrowers granted Fulton another mortgage on the Brigantine Property in the principal amount of $186,000.00; they did not disclose this to Plaintiff.

114. On or about March 27, 2019, Borrowers sold 268 Merion Ave. and did not notify Plaintiff.

115. On or about October 18, 2019, JW Home sold 248 Merion Ave., and Borrowers did not notify Plaintiff.

116.     On or about October 18, 2019, the mortgage holder on the Hopkins Ave. Property filed a foreclosure action against Debtor; he did not notify Plaintiff.

117.     Sometime in December 2019, Debtor obtained a personal loan in the amount of $100,000.00 from Edward Epstein ("Epstein") and granted Epstein a mortgage on the Brigantine Property to secure it ("Epstein Obligation").

118.     Debtor did not disclose the Epstein Obligation to Plaintiff.

119.     Sometime in July 2020, Bruce Schulkins ("Schulkins") filed suit against Debtor and JW Home alleging fraud and breach of contract in relationship to the 248 Merion Ave. property; Debtor did not notify Plaintiff.

120.     In July 2020, the Property became subject to tax sale certificate liens due to Borrowers' failure to pay property taxes.

121.     After closing on the Loan, Borrowers, directly and/or indirectly through Haven, their builder, requested the advancement of Loan funds ("Draws" or "Advances") for the construction of the Project.

122.     Borrowers, directly and/or indirectly through Haven, identified specific costs and expenses of the Project for which they were requesting Draws.

123.     Borrowers, directly and/or indirectly through Haven, submitted invoices and other information related to the costs of the Project for which they were requesting Draws.

124.     Borrowers, directly and/or indirectly through Haven, submitted Budgets to Plaintiff for the Project.

125.     Borrowers, directly and/or indirectly through Haven, designated if Draws should be applied to an account Haven held with Plaintiff ("Haven Account") or an account that Borrowers held with Plaintiff ("Borrowers' Account").

126.     JFW Consulting, LLC ("JFW Consulting") inspected the Property and provided Inspection Reports identifying construction progress.

127.     On or about July 12, 2019, Borrowers requested to increase the principal Loan from $1.6 million to $2.1 million.

128.     In support of the request, Borrowers submitted a Budget and represented to Plaintiff that they had contributed $178,000.00 of their own funds.

129.     Relying upon the Budget submitted by Borrowers and Borrowers' representation about having contributed their own funds, Plaintiff approved the modification of the loan from $1.6 million to $2.1 million.

130.     On July 12, 2019, the parties entered into a written Loan Modification Agreement, modifying the principal Loan amount to $2.1 million and extending the maturity date to December 1, 2019, with monthly payments to begin August 1, 2019 ("First Modification").

131.     In December 2019, when the Project was still not completed, Plaintiff agreed to extend the maturity to March 2020.

132.     From June 2018 through February 2020, Plaintiff made advances from the Loan funds to Borrowers, which advances were made to the Haven Account for use unless Borrowers specifically requested advances to the Borrowers' Account.

133.     From June 2018 to February 2020, of the funds advanced on the Loan, Plaintiff made advances from the Loan funds directly to the Borrowers' Account upon request by Borrowers totaling $850,433.43 ("Direct Advances").

134.     From January 2019 to February 2020, Borrowers paid American Express $150,396.15 from the Direct Advances ("Amex Transfers").

135.     Borrowers claimed that the Amex Transfers were to pay construction costs related to the Project that were paid using American Express; however, the claimed construction costs were $83,658.38, which is $66,737.77 less than the Amex Transfers.

136.     From January 2019 to February 2020, Borrowers transferred $110,604.64 from the Direct Advances to themselves, either by account withdrawals or by check.

137.     From January 2019 to February 2020, Borrowers used the Direct Advances to make payments on their personal debts, including the Loan, totaling $36,084.13.

138.     From January 2019 to February 2020, Borrowers used the Direct Advances to make payments to third parties, unrelated to the Project, totaling $39,482.97.

139.     On August 19, 2019, August 22, 2019, and January 2, 2020, the Borrowers' Account had insufficient funds to cover attempted transactions.

140.     On January 13, 2020, the Municipal Inspector for Cherry Hill recommended the issuance of a Temporary Certificate of Occupancy ("TCO") for the Barn at the Property, because certain required items were not completed; specifically, a gravel pave driveway, a driveway apron, a retaining wall, a fence along the road, and landscaping ("Completion Items").

141.     On January 14, 2020, a TCO was issued requiring the Completion Items to be addressed by March 14, 2020 to avoid fines or an order to vacate.

142.     On January 15, 2020, Debtor requested an advance in the amount of $91,377.83 for payment of the Completion Items; Plaintiff made the advance.

143.     On February 13, 2020, Borrowers attempted to pay American Express $500.00 from the Borrowers' Account, but the payment was reversed for insufficient funds.

144.     Borrowers failed to complete the Completion Items, and the TCO expired.

145.	On or about March 23, 2020, the parties entered into a written Loan Modification Agreement wherein Borrowers acknowledged the unpaid principal balance of $2,096,844.04 and agreed to submit three (3) monthly payments of $5,242.11 on the first (1st) day of each month beginning on April 1, 2020, with all principal and interest due on the new Maturity Date of July 1, 2020 ("Second Loan Modification").

146.	On or about May 12, 2020, Borrowers requested a deferment of their payment obligation under the Loan due to an alleged change in financial condition and financial hardship.

147.	Plaintiff agreed to defer Borrowers' monthly payment obligations for the period of March 23, 2020 through May 31, 2020 ("Deferment Period") with all interest due and payable on the Maturity Date.

148.	On or about May 12, 2020, Plaintiff and Borrowers entered into a written Payment Deferment Agreement wherein Borrowers acknowledged the outstanding principal Loan balance of $2,096,844.04 and agreed that monthly payments would be deferred during the Deferment Period and all interest would be due on the Maturity Date.

149.	As of the July 1, 2020 Maturity Date, Borrowers failed to complete the Project in accordance with the Plans, the temporary C.O. had expired, Borrowers had failed to obtain a permanent C.O. or extension of the expired C.O. for the Barn, Brian Wolfson had experienced a change in financial condition due to the termination of his prior employment, Borrowers had failed to pay property taxes, tax liens encumbered the Property, and Borrowers had ceased construction for ten (10) days.

150.	Borrowers failed to submit payment on or before the Maturity Date of July 1, 2020.

151.     On or about July 8, 2020, Plaintiff sent written notice to Borrowers of the Loan's maturity and Plaintiff's demand for payment in full.

152.     Borrowers failed to provide the requested information.

153.     On or about July 30, 2020, Plaintiff procured a title search of the Property showing Tax Sale Certificates for unpaid taxes in 2019 and 2020 as liens on the Property, including a Tax Sale Certificate purchase by a third-party on June 24, 2020 in the amount of $12,231.21 with a then-current balance of $15,952.16.

154.     Borrowers failed to advise Plaintiff about any unpaid taxes, tax liens, or Tax Sale Certificates relating to the Property.

155.     On or about August 3, 2020, Borrowers filed suit against Plaintiff in the Superior Court of New Jersey, Camden County, Law Division, Docket No. L-2617-20, alleging breach of contract and consumer fraud ("Law Division Action").

156.     On August 23, 2023, Plaintiff filed counterclaims in the Law Division Action against both Borrowers, which included counts for legal fraud, equitable fraud, negligent misrepresentation, fraudulent concealment, and constructive fraud, as well as an alter ego count as to JW Home and Funny Farm ("Counterclaim").

157.     On September 10, 2020, Plaintiff filed a foreclosure action in the Superior Court of New Jersey, Camden County, Chancery Division, Docket No. F-8123-20 ("Foreclosure Action").

158.     After several months of litigation, summary judgment was entered in the Foreclosure Action on July 2, 2021, and a final judgment in foreclosure was entered October 20, 2021 ("Foreclosure Judgment").

159.    Borrowers appealed the Foreclosure Judgment on December 2, 2021 and demanded that any sheriff sale be stayed pending appeal.

160.    On January 7, 2022, the Chancery Division entered an Order staying the sheriff sale pending appeal but requiring Borrowers to post a bond in the amount of $100,000 to compensate Plaintiff for interest accrued ("Bond").

161.    Borrowers paid the Bond.

162.    On June 22, 2023, the Appellate Division affirmed the Foreclosure Judgment.

163.    Debtor filed the underlying bankruptcy case under Chapter 11 on July 12, 2023 ("Petition Date").

164.    On August 4, 2023, Borrowers' claims against Plaintiff in the Law Division Action were dismissed with prejudice.

165.    On September 5, 2023, the underlying bankruptcy case was converted from Chapter 11 to Chapter 7.

166.    On September 8, 2023, Plaintiff was granted partial summary judgment against Laurie in the Law Division Action with respect to the counts for Equitable Fraud and Negligent Misrepresentation.

## COUNT I – NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

167.    Plaintiff hereby restates and incorporates the preceding paragraphs as though fully set forth at length herein.

168.    11 U.S.C. § 523(a)(2)(A) provides that a discharge granted in Chapter 7 does not apply to any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, false representations, or actual fraud, other than a statement respecting the debtor's financial condition.

169.     During the application process for the Loan, Debtor intentionally failed to disclose to Plaintiff that Fulton had denied multiple prior loan applications and in fact, intentionally and affirmatively represented that Fulton had approved a loan for the Project.

170.     Debtor leveraged his application with Fulton to obtain favorable loan terms from Plaintiff while misrepresenting the status of his application with Fulton.

171.     During the application process for the Loan, Debtor intentionally failed to disclose to Plaintiff that his income would decrease considerably in 2019.

172.     When Borrowers applied for additional loan funds and for an extension of the maturity date on the Loan in June 2019, Debtor again intentionally failed to disclose that his income had decreased substantially.

173.     Debtor intentionally used proceeds from the Loan to pay personal expenses unrelated to the Project and expenses of Funny Farm and JW Home.

174.     Debtor's misrepresentations to Plaintiff with respect to the status of his loan application with Fulton were made with intent to deceive and to induce Plaintiff into making the Loan; extending further credit; and extending the maturity date.

175.     Debtor's failure to disclose the change in his income was done with intent to deceive and to induce Plaintiff into making the Loan; extending further credit; and extending the maturity date.

176.     Debtor's misappropriation of the Loan funds was done knowingly and fraudulently.

WHEREFORE, Plaintiff 1st Colonial Community Bank demands entry of judgment against Debtor rendering Debtor's obligation to 1st Colonial, as described herein, nondischargeable in this and all future bankruptcy cases.

## COUNT II – NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)(B)

177.    Plaintiff hereby restates and incorporates the preceding paragraphs as though fully set forth at length herein.

178.    11 U.S.C. § 523(a)(2)(B) provides that a discharge granted in Chapter 7 does not apply to any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by the use of a statement, in writing, that is materially false; respecting the debtor's or an insider's financial condition; upon which the creditor reasonably relied; and that the debtor made with intent to deceive.

179.    Debtor knowingly and fraudulently represented to Plaintiff, in the signed Application, that no foreclosure proceedings had been initiated against him in the 7 years prior to the Loan.

180.    Debtor knowingly and fraudulently represented to Plaintiff, in the signed Application, false information about the encumbrances on the properties he represented to be his assets.

181.    Specifically, Debtor knowingly and fraudulently represented to Plaintiff that 248 Merion Ave. was owned by Borrowers and was free and clear of mortgages.

182.    Specifically, Debtor knowingly and fraudulently misrepresented the balance due on the mortgages for the Other Properties, despite having obtained mortgages on the Other Properties during the application process.

183.    Debtor knowingly and fraudulently represented to Plaintiff that he had an ownership interest in 248 Merion Ave. when in fact, he knew that JW Home owned that property.

184.     Debtor knowingly and fraudulently represented to Plaintiff that he was not a co-borrower on any notes.

185.     Plaintiff reasonably relied upon Debtor's false representations.

186.     Debtor provided paystubs and tax returns to Plaintiff that, when taken at face value, supported Debtor's representations about his income; however, the tax returns provided did not reflect the change in income, as they were filed prior to Debtor's employment change, and the paystubs provided did not accurately reflect Debtor's future income.

187.     The foreclosure records were not on Debtor's credit report.

188.     Debtor carefully chose correspondence with Fulton that he forwarded to Plaintiff, such that the forwarded correspondence was favorable while unfavorable correspondence was omitted.

189.     Debtor was extremely involved in the application process and very communicative with Plaintiff.

190.     Debtor is a sophisticated debtor with significant experience engaging in real estate transactions and lending related thereto.

191.     After the Petition Date, the Superior Court of New Jersey granted summary judgment in Plaintiff's favor and against Laurie on its counterclaims for fraud based upon Borrowers' fraudulent misrepresentations in the Application.

WHEREFORE, Plaintiff 1st Colonial Community Bank demands entry of judgment against Debtor rendering Debtor's obligation to 1st Colonial, as described herein, nondischargeable in this and all future bankruptcy cases.

## COUNT III – NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(4)

192.     Plaintiff hereby restates and incorporates the preceding paragraphs as though fully set forth at length herein.

193.     11 U.S.C. § 523(a)(4) provides that a discharge granted in Chapter 7 does not apply to any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

194.     The Loan proceeds were to be used to fund the completion of the Project.

195.     The Draws funded from the Loan proceeds were paid to Debtor for the purpose of completing Project items and not for any other purpose.

196.     The Loan is secured by the Property, which was to be improved using the Loan proceeds.

197.     Debtor's possession of the Loan proceeds was lawful; however, fraudulent appropriation of the Loan proceeds for any purpose other than funding the Project, for his own benefit, intentionally and with knowledge that the Loan proceeds were to be used for the Project, was done without Plaintiff's consent.

198.     Debtor's use of the Loan proceeds for any purpose other than the Project was done with fraudulent intent.

199.     To the extent that Debtor used Loan proceeds for purposes unrelated to the Project, Debtor embezzled Plaintiff's property and therefore, to the extent that the Loan proceeds were used for any purpose other than funding the Project, the Loan should be rendered nondischargeable.

WHEREFORE, Plaintiff 1st Colonial Community Bank demands entry of judgment against Debtor rendering Debtor's obligation to 1st Colonial, as described herein, nondischargeable in this and all future bankruptcy cases.

Respectfully submitted,
SALDUTTI LAW GROUP
Counsel for the Plaintiff

*/s/ Rebecca K. McDowell*
REBECCA K. MCDOWELL, ESQ.

Dated: December 14, 2023